This is a new experience for me. Good morning. I'm Steve Emmert and along with Doug Desjardins, I represent the two injured parties in this case involving insurance coverage. It is my preference, and I suppose your preference as well, that in oral presentations I not tell you orally what we just got finished telling you in writing. I therefore propose instead to focus on what I believe is the one issue that presents the narrowest and best grounds for the court to decide this appeal. We'll save judicial resources because it will exclude the necessity to decide all the issues in the case. I'm satisfied that the briefs set up the chess pieces satisfactorily for the other issues that you can decide those cases there if necessary. The issue that I propose to describe to discuss today is res judicata. The first question that I have to address for you based upon what I see in the briefs is the effect of the interpleader dismissal in the tort case. Can I ask you a preliminary question about res judicata? Yes. At the underlying lawsuit against the balloon company and owner, that occurred in federal court, right, in Maryland? Right. And the settlement says that Pennsylvania law governs the settlement except for choice of law. I think that's right. And our court has said that the res judicata effect of a lawsuit that was premised on diversity jurisdiction is determined by the law of the state where that settlement was, where that lawsuit occurred. So why doesn't Maryland law govern the res judicata effect? I think I can tell you that I don't think that it matters because based upon what I've seen from the case law in the two jurisdictions, I don't believe there's a meaningful difference. I think it does. I mean, you're right that res judicata has general principles, but Maryland also has specific law about res judicata in an insurance context when you have a liability finding, and then you have a coverage dispute later. And Maryland seems to prefer that the coverage dispute not encroach on the liability suit. And so they have specific cases holding that the liability resolution doesn't act as an estoppel or a waiver against an insurer in a subsequent declaratory action. In the circumstances that we have here, because of the decision that the insurance company made, the coverage issue was part of the tort case. So it wasn't a subsequent action. The insurance issue was brought in as an interpleader proceeding or a counterclaim. So the insurer inserted the question of coverage into the original tort action. Right. But Maryland seems to not prefer that. And so they don't have an estoppel effect there unless, I mean, I suppose if you have a specific provision in your settlement that they do agree to coverage. But I was troubled that neither party is arguing Maryland law here. And the district court also didn't apply Maryland law. Everyone is applying federal law to this res judicata question. I understand that the Semtec case that the Supreme Court decided generally held that in questions of the effect of res judicata, the federal law governs. And again, I don't think that's any different. No, that's not correct. When you're determining the res judicata effect of a judgment in a district court that was applying diversity jurisdiction, the Supreme Court has said, and we have applied this in Q International Courier vs. Smoke. We specifically addressed this exact question and said, you apply the law of the state where the previous diversity action was resolved. I would respectfully disagree with Your Honor. In the Semtec case at page 508, the court says federal common law governs the claim preclusive effect of a dismissal by a federal court sitting in diversity. So the Supreme Court has decided otherwise. I would point you to our Smoke decision. Okay. Since it troubles Your Honor, I would offer, if the court is willing to do this, to present supplemental briefs with certainly an invitation to the insurer to provide that as well. I don't know that that's necessary because, I mean, we can agree to disagree that res judicata is your best argument, but you can go ahead and argue it if you want. Okay. I do propose to argue it. But in this case, the first question that I have to address is the effect of the dismissal of the interpleader claim in the tort case. The insurer placed that in issue, as I mentioned a few moments ago. They inserted that question into the tort decision. They retained defense counsel, filed this action, asking the trial court expressly to find a $200,000 coverage limit for the benefit of the insureds and expressly for the benefit of the insurer. We find that on pages 294 and 295 of the joint appendix. We answered the counterclaim saying that the million-dollar limit applied. And at that point, the parties were at issue on this question. It was actually presented in the case and was a matter to be determined by the court in the ultimate trial. When the insurers retained defense counsel consented to dismissal of the counterclaim, that meant that since the parties were at issue, it has preclusive effect, and we're entitled to a finding otherwise. But preclusive what? What does that do for you if we say that that has preclusive effect? Do you collect? There's nothing saying that you do. Well, we get to litigate the issue of bad faith. That's what we're going to be. That's what we're asking for is the court reversed and remand this case to the trial court, the district court for a trial on the issue of bad faith. That's what we're looking for here. The court already said there wasn't that there's not bad faith here. That wasn't tied to the res judicata decision. That's separate. Actually, I think it was, Your Honor, because the court found that the insurer was correct on coverage. It held that there was actually a $200,000 limit. And so, therefore, they were right on it, and they couldn't be found to have been in bad faith since they offered to settle within that original policy limit. That wasn't the reasoning. The court knew that you can have you can still have bad faith, perhaps, in occasions where coverage turns out to have been correct on coverage. But the court said they did enough investigation to discover that what they needed to know to determine that this was, in fact, the lower coverage limit that applied. I understand, Your Honor. As I put in the briefs, or I didn't put in the briefs, the parties put in the briefs. I'm a more recent comer to this case. As the briefs indicate, that was a matter that the court took away from a jury on summary judgment by determining issues of fact, by determining who's right, by determining whether the insurance company had done enough. And that's not an issue of law. That's an issue of fact that was, I believe, tainted by the court's decision that the $200,000 limit applied. That's why this case needs to go to a jury to determine whether what they did was sufficient. They made a decision in November, no later than November 2016, before they filed an answer that they were going to take this interpleader approach to preserve their own assets, to force $200,000 down the plaintiff's throats and make them take it. That was the decision they made initially before they filed an answer. So that's why I think this is a question that, even assuming Your Honor is right, that that was only a minor issue, that it's part of the issue. And the court took the issue away from a jury incorrectly. Well, the whole question on that, right, is just did they know, did they do enough investigation to know that your clients were still passengers, right? They don't need to know exactly how the injury happened and work out all the, you know, scientific causality to determine. I mean, the coverage A or coverage B is just a question of were you in the basket or even if you were out of the basket, were you still, do you still consider it a passenger? The record indicates that they didn't investigate that issue until they filed the declaratory judgment action, which I think was in 2018, long after they filed the answer. Yeah, sure they did. They heard from the insured. The insured told them, this is what I saw. This is what everyone else saw. Again, I think your argument in the briefs was, well, they didn't have sort of like electrical conductivity studies and that sort of thing. But that's clearly not what they needed to do to decide, you know, do we have clear evidence of, you know, in the basket, out of the basket? I understand. And as we've seen from the photographs and the description, the basket landed and pitched over and the passengers were thrown out of the basket, after which the electrocution occurred. Now, they didn't investigate where these people were with relation to the basket until well after the suit was filed. And that's something that the trial court took into its own hands rather than allowing a jury to make the factual finding of, did they do this? Now, again, Your Honor and I can disagree on this, but I think that's what the record indicates, that they waited years to determine whether there was an investigation necessary. They did a paltry investigation at the beginning and immediately sought about, I guess I can call it confirmation bias, to find out the matters that set their existing preference. The bad faith claim is the only way that you get beyond a million dollars per person, is that right? I think that's correct, Your Honor. Yes, that's right. So let me- You want a jury trial to figure out whether they were passengers or not? Is that the issue? The whole issue. I understand that. And I want to make sure that I phrase this carefully. The, because of the, we believe that the issue of whether a million dollar policy limit or $100,000 policy limit applies is now res judicata. We want a jury trial on whether the insurer acted in bad faith by not settling within the policy limits when they had an opportunity. You think it's already a million dollars? I believe it is. All right. Because the insurer asked the court, put the matter in issue, and the court issued a decision. Why then are you arguing about the, or did you try to get the expert testimony in? Frankly, this is one of those issues that I don't believe you need to reach if you- You're not worried about the, you don't need the expert testimony anymore. If it's res judicata, no, I don't. Well, if it's res judicata, but you don't have that. Well, not yet. We'd have to agree with you on that. I can always hope for a jury review. And you think that the interpleader procedure was all in bad faith? That's evidence of the bad faith? Well, it's more than- The fact that they pursued the interpleader? It's more than that, I think. But the fact that they did that, indeed, to preserve their own assets, thereby exposing their insurance, is one aspect of that. But arguing about a legal procedure shouldn't, can that be evidence of bad faith? People should be able to, or parties should be able to litigate. It's a part of the adversary system. I understand. But there's more than just that there. The expert that the court did at least consider on summary judgment that we had, who testified about matters of insurance, investigation, insurance defense, and the standards of practice there, testify that they should have investigated this early, should have taken into consideration the liability issues and so forth. So let me sit down now and ask for the opportunity to respond after this. And you've saved some time. Mr. Kozloff? Good to have you with us, sir. Good morning, Your Honor. Good morning, Judge King, Judge Rushing, and Judge Traffler. May it please the court, Louis Kozloff on behalf of the appellee THE Insurance Company. We ask the court to affirm all of the rulings by the district court below. First, the district court correctly determined that coverage B of the THE policy applied to the appellant's claims against the insured because based on the undisputed facts of how the accident occurred in the clear policy language, the appellants were policy-defined passengers when they were injured in the operation of hot air balloon. Second, district court correctly granted summary judgment for THE on the bad faith counterclaims asserted by the appellants because THE correctly and reasonably determined that offered the full limits of coverage B in order to settle those claims against the insured, which was the full extent of its contractual obligations with its insured because coverage B did, in fact, apply. And that determination that coverage B applied was based on a reasonable investigation, a thorough investigation of the material facts that would be determinative of whether coverage A or coverage B applied to this accident. Third, the court's ruling on res judicata was correct in that there was no final judgment on the merits in the prior action, including the interpleader action, on the question of whether coverage A or coverage B applied. That issue, THE was entitled to litigate through the declaratory judgment action it filed before the settlement of the underlying case. And the settlement of the underlying case, which led to the dismissal, makes no mention of how that dismissal and settlement would impact the question of coverage that was presented in the declaratory judgment action. And fourth, the court was correct in striking the expert report of the appellant's expert, Colin Sommer, who based his opinion on whether or not the appellants were occupants of the balloon on facts that were not supported in the evidence and, in fact, contrary to evidence in the record. Can I ask you about that? It seemed to me that there were two, the expert had two different grounds for saying that they were occupants of the basket. One, it's just kind of asserting the fact, right? He says, in a few places in this opinion, he just says, you know, they were, presumably, they were in the basket when it happened, right? Outside, I think. Or outside, I'm sorry. So I agree with you. He can't just make up facts. There has to be facts on the record. But there's also, arguably, this scientific chain of events where he talks about, you know, the way that the electrical current would be conducted and, like, therefore, we can deduce they were outside the basket. That's certainly, if he's an expert in that subject, that's certainly a legitimate way to counter eyewitness testimony, right? You could have a witness, an eyewitness who says, they were definitely in the basket. But if you have a scientist who comes in and says, I know how electrical current works, and that leads me to believe they were outside the basket, that's a legitimate, that's a material dispute of fact. And so, do we have to, we have to talk about the district court's ruling that this expert wasn't qualified to opine on how the electrical current would have run here, don't we? I think we need to talk about both. And the second issue is important, that in order to establish the appropriate qualifications to render that opinion, to be helpful to a jury under Daubert, he needed to demonstrate that he had adequate, sufficient qualification, scientific knowledge to render opinion on how electricity would flow from the overhead power line through the balloon system to, through the appellants and to the ground. And the court determined that based on what was presented in terms of his discretion that the district court judge has in evaluating an expert under Rule 702, determined that Mr. Somer didn't have adequate qualifications to render those opinions. On the first point of whether his opinion was or was not based on adequate facts in the record, his opinion on how they were injured and where they were in relation to the balloon was so dependent on his assumption that they had exited the balloon. And that was the only way in which they could have been injured was flawed. And so contrary to, and it's not just one or two experts, all, I'm sorry, not experts, witnesses. It was so contrary to all evidence presented as to how the accident occurred that it was unreasonable to make that assumption and base an expert opinion upon it. Do you have a fallback argument, right? I don't know. Maybe it's not charitable fallback, but you have an argument that you don't even need to prove that they were in the balloon, right? You think they could be a passenger even if they were outside because of the timing and the way the policy is written. So you wouldn't even need to address the expert issue. That's right, Your Honor. The much ink has been spilled on the question of whether or not they were inside the basket when the accident occurred or not. The overwhelming evidence is that they were in terms of how the accident occurred. But even if they had fallen out, crawled out some way, their bodies were not within the contours of the basket when the electrical shock occurred. That doesn't change the fact that coverage B applies to this loss because of the broad policy wording on defining a passenger, which says that a passenger is someone other than the pilot in or entering the hot air balloon for purpose of riding therein or alighting them therefrom following a flight or attempted flight. I hope our brief presented the facts of the accident well because they are important. As the balloon landed and was initially grabbed by the ground crew, the balloon comes in at an angle, doesn't come straight down. It's secured by the ground crew. And as that happened, a vent line was caught and caused the balloon to lose air, lose heat and start to deflate. And when that happened, the balloon drifted towards power lines that were adjacent to where they landed. And as the balloon drifted, the basket is on the ground. As the balloon drifts laterally towards the power lines, it also pulls the basket laterally. Balloon envelope then comes into contact with the power lines. And because it's being pulled, the basket tips over. When it hits the power lines and energy starts to flow through the balloon structure, the crew holding it let go. They felt a jolt. At that point, everyone was still inside the basket, the pilot and the two appellants. They let go, the basket falls over. When it falls over is when the appellants unfortunately came in contact with the ground. And because the balloon was energized and they were still standing within it and in contact with it, they were in contact with both an energized part of the balloon and the ground and the electricity flowed through them causing injury. Even so, that's what the evidence shows. But even if they were outside, even if they had fallen completely out of the basket when it tipped over, which again, the evidence doesn't show, they were still, they had to be in contact with some part of the balloon in order to be injured because that's how the electricity could have flown. And in that instance, they are still engaged, as the policy defines, passengers and therefore subject to coverage B. So the question of whether they were inside or out is not material to the determination that coverage B applied. And that was part of THC's investigation. That was the reason why their investigation of coverage and the response to the bad faith claim is that there was a thorough investigation. They evaluated what happened. They had an understanding of the facts of how the accident happened from an interview. Can you tell me what were the steps, what investigation did they do before that determination or before making the offer under the lower limits? Right. So there were multiple phases. The initial investigation was within a week of the accident occurring. The accident occurred and the claim was immediately presented to THC. And the claim representative, Barbara Fellows, had a telephone conversation with Mr. Fisher, the pilot, within days of that accident. And he spoke to her about what happened. She took very detailed notes of what happened, which are in the file. And then she summarized those findings in a report in her file. So based on her conversation with him, the most important witness, after the accident, she had an understanding of what happened. After that, in the course of the investigation, they received reports from the NTSB and FAA which also described what Mr. Fisher explained happened in the accident. And that led to the conclusion, the appropriate conclusion, that coverage B applied to this claim. And within a little over a month of the accident occurring, THC offered the coverage B limits of $100,000 each for each passenger to settle the claim. That offer was not accepted. The case then eventually, a year later, went into litigation. And the next important point was in 2018, May, June 2018, when a settlement demand was made by the Appellants' Council for a dollar less than the $1 million limits under coverage A. And at that point, THC again investigated all facts that it had at the time, plus an investigation of the law that would apply to the policy to determine whether coverage A or coverage B applied. And that assessment led to the conclusion that factually, Ms. Davis and Mr. Spencer were found in the basket after the accident and were occupants of the basket when the accident occurred. But also, even if you assumed that they were not, and if you assumed that they had fallen out or crawled out or somehow removed themselves from the basket under the law, which we've discussed in our brief, they would still be policy-defined passengers and therefore coverage B applied. So that's the investigation. That led to the consistent position that the coverage B limits applied and the consistent position of making those limits available, which was the full contractual benefits that the insurers obtained in the policy to make those limits available to settle the claims. And which state law applied to all this? For the coverage issues and the bad faith issues, Pennsylvania law applies. All this occurred in Lancaster County? Correct. Just over the line from Pennsylvania, from Maryland? Yes. But the plaintiffs were from Maryland? The plaintiffs were from Maryland. And they sued in Baltimore? Correct. There was no argument that Maryland law should apply? Not to the coverage issues, no. Based on the policy being issued to the insurers in Pennsylvania and the accident happening in Pennsylvania, there's never been an argument that any law other than Pennsylvania applies to the interpretation of the policy or the bad faith claim. And with respect to Pennsylvania law, with a policy like this covering aviation operations, they're fairly unique. And we have cited Pennsylvania law in the Loomer case that discusses the concept of when someone would be a passenger or a lighting from an aircraft. But we've also cited cases from other jurisdictions on this particular issue. When does an occupant of an aircraft cease to be an occupant? And does an occupant cease to be an occupant when they're standing outside after being a passenger in that aircraft? So certainly, Pennsylvania law is important to both, but the law from other jurisdictions really determine the ultimate question of coverage here. I'd like to discuss the... Sorry, one more question while we're talking about what law applies. Do you have an opinion about whether Maryland law applies to determine the residue kind of effect of a Maryland settlement, settlement in Maryland court and diversity? I don't, Your Honor. I would like to have the opportunity to look at that further if needed, but I hadn't considered it before today and presented in the briefing, but I appreciate your insight on it. With respect to the bad faith claims, I want to talk about the contractual bad faith claim first because both bad faith claims are very tied to the... Inextricably tied to the question of coverage and none more so than the contractual bad faith claim. Contractual... Pennsylvania has two concepts of bad faith. There's the statutory bad faith claim under the bad faith statute, 42 Pennsylvania CSA section 8371. But the contractual bad faith claim is different and that's the claim that's brought saying that THC was unreasonable in not settling the underlying claim for the coverage A limits rather than the coverage B limits. And that claim is based on Pennsylvania Supreme Court authority, two cases, the more recent which is the birth center versus St. Paul company's case. The earlier one is Cowden. And in those cases, the rule established is that an insurer has an obligation to make the applicable limits of coverage available and settle a claim within the available limits of coverage when it's reasonable to do so. The Pennsylvania law does not say that an insurer is obligated to offer more than the policy limits in order to settle a claim against this insured. And that is why the trial court, the district court correctly determined that once it decided correctly that coverage B applies, the contractual bad faith claim must be dismissed because THC did in fact offer the coverage B limits and fulfilled its full obligation. By offering the $100,000 each, you hear that, that's your position. Right. That is the limits that were applicable under the policy and in the Cowden and birth center contractual bad faith claim that is its contractual obligation in good faith to offer those limits. The statutory claim, statutory bad faith claim is also tied closely to the question of whether or not coverage A or coverage B applies. But it also has the element of the investigation that the insurer conducted in order to come to that determination. And as we've discussed both in our briefing and today, the investigation and the conclusion that coverage B applied gave every consideration to the alternative theory that the appellants may not have been within the balloons basket and therefore may not be considered policy defined passengers and concluded that that discrepancy in the facts or that potential discrepancy in the facts would not be material to the question of whether coverage A or coverage B applied. Do you agree that the statutory cause of action that hypothetically, I'm not saying that's the case, but hypothetically, if there could be a cause of action under the statutory bad faith, even if you were right about coverage, but if you hadn't done any investigation to make that determination, say there was, you know, zero investigation, but you just decided the lower limit applies. That could be a statutory bad faith claim in that instance. Pennsylvania law is not well determined on that. It hasn't been decided by the Pennsylvania Supreme Court on that. I think what the case law shows is that there is a connection between the coverage decision and the investigation under the statute and the way the statute has been interpreted. And this is from the Rankoski case, Pennsylvania Supreme Court case from 2015, which is the Supreme Court expressly stated the standards for a claim under the 8371 statute. And it said that to prevail on a bad faith claim, the plaintiff must demonstrate by clear and convincing evidence that the insurer did not have a reasonable basis for denying benefits and that the insurer knew or recklessly disregarded its lack of a reasonable basis for denying the claim. So based on that, there is a connection between whether or not the insurer provided benefits that were required under the policy, provided the coverage that was required under the policy. So you can't divorce that from the second element of whether there was a reasonable basis. The reasonable basis part of the standard is the investigation and whether the insurer did through its investigation have a reasonable basis. So I think that you can and need to look at both. But if a coverage determination is correct and based on an appropriate investigation, reasonable investigation to provide the insurer with a reasonable basis for its decision, then there's no bad faith. I see my time is up. And unless the panel has any other questions, I thank you. Thank you, Mr. Kosloff. Good to have you with us. Mr. Hammond. Thank you, Your Honor. And I suspect I'll be able to give you a substantial amount of change back from your eight minutes. I can be briefed by addressing just a few of the issues that Mr. Kosloff addressed in his excellent presentation. First, on the facts, Mr. Kosloff has just told you his version of them. And his narrative is such about what happened when the balloon fell over. He disagrees with our expert as to what happened. The jury might not. The jury might very well find that. The trial court in this case incorrectly weighed the evidence and decided what happened on the ground. Also weighed the evidence as far as Mr. Shartz's testimony as to whether the investigation was reasonable or not. The district court can't do that. That's up to a jury to do. Next, I want to mention that as far as its cursory review before making a decision to willfully close its eyes to information, the insurer never got the National Transportation Safety Board or the FAA reports on this at the time they made the decision or even well into the time they were defending the action. They waited until late 2017 or early 2018 before deciding maybe it would be a good idea to take a look at these things because they didn't fit the narrative. In litigation, every litigation, lawyers make decisions. Those decisions have consequences. In this case, the insurer made a decision that it was going to, as I mentioned before, perhaps impolitely, stuff the $200,000 down the plaintiff's throats and force them to accept it. That was a decision that it did not for the benefit of the insured, not for the benefit of the parties who were the beneficiaries of the policy, but to protect its own interests. And the record is quite clear on this. Even in documents that come from the insurer, they were doing it for their own interest. In a situation like that, that decision had a consequence, and the consequence is once they decided to terminate the case, then they would have lost that issue. They placed an issue and they lost it. We cite one case, and I've forgotten which one it was in our briefs. The one that comes to my mind because of when I went to law school was the Parkland-Hosiery case that says that each party is entitled to one full and fair opportunity to litigate a case, to get a judicial disposition of one of their issues. The insurance company chose for itself the full and fair opportunity to litigate the coverage issue in the tort case. They placed an issue. They agreed when it was dismissed. They don't get more opportunities. Again, the Supreme Court in that case didn't say one and full and fair disposition, an opportunity to litigate. They claimed it, and then they threw it away. That decision by a lawyer has to have a consequence. I thank you for your courtesy to me today and for your interest in the issues of this case. Thank you very much, Mr. Emmert. Good to have both of you here. If we could come down and reach you, we would, but the rules are against that right now. So we'll take a brief recess, Madam Clerk, and then reconvene for the next case in a few minutes. This honorable court will take a brief recess.
judges: Robert B. King, Allison J. Rushing, William B. Traxler Jr.